Jim L. STANLEY, Plaintiff,

v.

The BIG EIGHT CONFERENCE, Charles M. Neinas, Commissioner of the Big Eight Conference, and all other Officers of the Big Eight Conference, Defendants.

No. 78–0891–CV–W–3.

United States District Court, W. D. Missouri, W. D.

Dec. 21, 1978.

C. Brooks Wood, Hillix, Brewer, Hoffhaus & Whittaker, Kansas City, Mo., B. J. Rothbaum, Jr., James P. Linn, Linn, Helms, Kirk & Burkett, Oklahoma City, Okl., for plaintiff.

Robert E. Northrip, Charles R. Wall, Timothy A. Pratt, Shook, Hardy & Bacon, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

RUSSELL G. CLARK, District Judge.

This matter is before the Court on plaintiff's complaint seeking certain injunctive relief against the defendants.

The defendants had scheduled a hearing on November 30, 1978 to determine if Oklahoma State University (OSU), its staff members, representatives of the University's athletic interests, or students enrolled in its football athletic program had violated rules of the Big Eight Conference and of the NCAA for which sanctions or penalties should be imposed.

Plaintiff, Jim Stanley, was the head football coach at OSU until mid-November, 1978.

On plaintiff's application, this Court entered its Temporary Restraining Order on November 30, 1978 and thereafter a hearing was held on plaintiff's application for preliminary injunction on December 14, 1978.

Jurisdiction of this Court is found under the provisions of 28 U.S.C. § 1331 and the cause of action arises under 42 U.S.C. § 1983 and the Fourteenth Amendment of the U.S. Constitution. For the reasons stated herein, plaintiff's application for a preliminary injunction is partially granted.

## FINDINGS OF FACT

### Facts Stipulated by the Parties

1. The Big Eight Conference (Conference) is a voluntary, unincorporated association comprised of eight state universities situated in six states. The member universities are: Iowa State University; Kansas State University; Oklahoma State University; University of Colorado; University of Kansas; University of Missouri; University of Nebraska; and University of Oklahoma. The Conference, in turn, is a member of the National Collegiate Athletic Association (NCAA), which is a voluntary, unincorporated association of approximately 830 members consisting of colleges and universities, conferences and associations and other educational institutions.

2. Duly promulgated NCAA rules and official interpretations are incorporated by reference into the Conference governing matters not otherwise covered by Conference Rules.

3. A copy of the final investigation report was distributed to all faculty representatives and athletic directors after 6:00 o'clock on the day prior to the proceedings.

4. The proceedings on the alleged violations would have been conducted, in part, as follows:

(a) The proceedings are conducted by a group composed of faculty representatives and directors of athletics of the member institutions not involved in the investigation.

(b) Those entitled to be present would have been in addition to Commissioner Neinas:

1. Representatives of OSU.

2. Jim Stanley.

3. Present or former staff members of OSU involved in allegations.

4. Student-athletes involved in allegations.

5. Legal counsel for the above.

6. Individuals asked to attend by any of the above.

(c) The proceedings would have been and will be closed and chaired by the Chairman of the Conference. The proceedings would have been tape recorded with a transcript available at the request of anyone who participated or their representatives.

(d) The proceedings begin with a presentation by Commissioner Neinas based on his final confidential report. Members of the group would have been permitted to ask Mr. Neinas questions concerning the report as will representatives of OSU and Mr. Stanley and his representatives. Commissioner Neinas will not give his personal opinion of whether violations of Conference rules have or have not occurred nor will he make any recommendations regarding whether penalties should be imposed.

(e) OSU would have had the opportunity to make a presentation by its representatives and attorneys of any information they choose using other individuals, reports, documents and oral arguments.

(f) Jim Stanley would have had the opportunity to make a presentation by his representatives and attorneys of any in-

formation he chooses using other individuals, reports, documents and oral arguments.

(g) The order of presentation may be changed at the request of a participant and with the approval of the Chairman and the group.

(h) During the proceedings all participants, including legal counsel, have the opportunity to ask questions of all other participants.

(i) Neither the Conference nor any other participant has subpoena powers.

(j) The group has never required that the information to be presented to it in determining whether a rule violation has occurred be presented in the form of live witnesses.

(k) The above procedures for these types of proceedings have been in effect since 1972 and have been followed in all such cases since that time.

*Facts Found From Evidence Offered*

1. Rules and regulations governing athletics for the Big Eight Conference were admitted into evidence as plaintiff's Exhibit 2. Those rules, among other things, provide that the Commissioner shall be responsible for compliance with the Conference regulations and shall employ a chief investigative officer to conduct inquiries into alleged violations; that when an investigation indicates that a violation probably did occur, the faculty representatives and athletic directors excluding those whose institutions are involved "shall hear evidence, determine findings of fact and assess penalties". Penalties which may be assessed by the conference are set forth in Rule 5.2 of the conference rules and provide as follows:

5.2011 The offending institution or staff member may be reprimanded by the Conference and warned against repetition of the offense.

5.2012 The guilty staff member may be denied the privilege of contact with any prospective athlete for a period to be determined by the Conference, and a similar penalty may be imposed upon all staff members of the sport involved, including staff members employed after the sanction is imposed.

5.2013 The institution may be denied the right to schedule contests with other Conference members in the sport in which the violation occurred and/or vacate its place in the Conference standings for that sport. The institution may also be denied the right to compete in post-season competition, including but not limited to participation in NCAA championship events.

5.2014 Conference institutions may be directed to discontinue the scheduling of contests with a member institution.

5.2015 A student-athlete or prospective student-athlete may be declared ineligible, the term of ineligibility to be determined by the faculty representatives unless specified elsewhere in these regulations. Such penalty of ineligibility shall be considered in case of any violation of the PRINCIPLES GOVERNING RECRUITING (Conference Rule 4) by a member institution or representatives of the institution's athletic interests, whether committed with or without the knowledge of the institution involved. Where there is significant evidence that improper or unethical conduct may exist on the part of the student-athlete in establishing academic qualifications, then the student-athlete shall be denied eligibility for financial aid, practice, or competition in athletics until the student athlete has made a full disclosure to the institution or the Conference of all relevant facts, including high school records and qualification test data.

5.2016 Athletic events in which an ineligible athlete participates shall be forfeited by the institution using the ineligible competitor. Exceptions may be permitted upon appeal to the faculty representatives and directors of athletics.

5.2017 A member institution may be placed on probation for a specified period and the institution denied specific privileges of membership, including the

right to appear on any television program or series subject to the control and/or administration of the Conference or the NCAA.

5.2018 The Conference may reduce the number of initial, additional, or overall financial grants-in-aid awarded by the offending institution in a specific sport for a specified period of time.

5.2019 The Conference may require the offending institution to show cause why a penalty or an additional penalty should not be imposed if, in the opinion of the Conference, the offending institution does not take appropriate disciplinary or corrective action against the athletic department personnel involved in the infractions case, any other institutional employee if the circumstances warrant, or the student-athlete involved or representatives of the institution's athletic interests.[1]

2. Such an investigation was begun as to OSU's athletic program about the mid-part of June, 1978 and concluded during the latter part of October, 1978.

3. The Big Eight Commissioner Charles M. Neinas assigned the investigation to a Mr. Dick Martin. Mr. Martin had conducted approximately 20 to 25% of the investigation when he decided to apply for the position of athletic director at OSU. Mr. Neinas thereupon relieved Mr. Martin and assumed the investigative duties himself. In October of 1978, after the position of athletic director at OSU was filled by someone other than Mr. Martin, Mr. Martin assisted Mr. Neinas in concluding the investigation. Approximately 75 people were interviewed, some of whom are current student-athletes at OSU. These students were interviewed in the presence of a representative of OSU but not in the presence of Stanley.

4. Mr. Neinas prepared an eighteen page detailed report covering the investigation made by him and Mr. Martin. This report was entered into evidence as plaintiff's exhibit 1. With the exception of statements made by the writer as to the various people whom he interviewed, the report in its entirety constitutes nothing but hearsay and in many instances hearsay based upon hearsay as well as contradictory statements between various people interviewed.

5. The investigation was conducted on a cooperative basis with the NCAA. After concluding its proceedings, the Big Eight will then file a report of its actions with the NCAA which it can accept, or it may impose additional penalties or sanctions if infractions of NCAA rules are found. The NCAA is also free to open its own investigation.

6. Mr. Neinas testified that one of the practical effects of the open ended "show cause" provision is that the Big Eight Conference is capable of prohibiting an individual from coaching at any other member institution as well as the subject institution. Although the Big Eight does not have the ability to "hire and fire" coaches, it may request the member institution to show cause why more appropriate corrective disciplinary action should not be taken. Additionally, the NCAA Rules of Enforcement 7–(b)–(12)(i), (ii), and (iii) clearly state that if in the opinion of the NCAA, the institution did not take sufficient corrective and disciplinary action, the NCAA may require that institution to show cause why additional discipline should not be imposed. These additional actions are defined to include the termination of the coaching contract of the head coach and the "debarment of the . . coach from any coaching, recruiting or speaking engagements." A fair inference can be made from these regulations that the Big Eight may indirectly prohibit the individual from coaching within its ranks and the NCAA may effectively "blackball" an individual, to use the terminology of Mr. Glossen, from coaching at any of the 830 member institutions.

---

1. Mr. Neinas testified that no sanctions can be imposed upon an individual if that person is no longer associated with a member institution. The institution may receive sanctions however based upon that individual's activities.

7. A Big Eight hearing on any alleged infraction concerning the football program of a member institution is premised upon the proposition that the head football coach of that institution has overall responsibility for the entire program. Therefore, any hearing concerning a member institution's alleged infraction would necessarily implicate the head football coach.

8. The investigator possesses the power of granting "immunity" to an interviewee. This immunity is an agreement that the person providing the information may not be personally charged with an infraction in return for his supplying information to the investigator. Since Mr. Neinas has been the Commissioner of the Big Eight, he has not exercised this power.

9. The investigations preceding the hearing before the Big Eight Council are based upon interviews with individuals who may have knowledge of the alleged infractions. If conflicts in allegations arise, the investigator may seek to reinterview the individual to obtain clarification. If the conflict is unresolved, the information may still be utilized if it fits a pattern or trend of information which the investigator has already discerned. The investigator writes the report which is then presented to the Council.

10. When Mr. Neinas or Mr. Martin interviewed individuals associated with OSU in connection with the preparation of the report, OSU was provided the opportunity to appoint a representative to be present during the interviews. In none of these interviews was Stanley chosen by the University as its representative.

11. Mr. Neinas testified that he will present his report based upon his investigation but he does not vouch for the veracity of the statements made in the report. He testified that he tries to present the facts "the best we can in an objective fashion."

12. Mr. Neinas testified that it has been his experience that often young men who have been interviewed may have misconstrued certain facts and that if an individual recants his statements, another interview may be necessitated. If the statement is changed after the hearing, the hearing may be reopened to receive the additional facts.

13. The Big Eight has not, to the best of Mr. Neinas' recollection, ever presented testimony by way of live witnesses at hearings of this nature. However, Mr. Neinas stated that during one hearing, a subject institution did choose to present live testimony on its behalf. In the scheduled hearing on this matter, Mr. Neinas stated that no witnesses would be called by the Conference to substantiate its allegations.

14. Mr. Neinas testified that in his opinion a signed written statement or a signed affidavit by an interviewed individual would not deter the investigative process and would in fact assist the hearing body to weigh the veracity of the information in the report.

15. Professor Henry T. Lowe, Professor of law at the University of Missouri and the Faculty Representative to the Big Eight Conference from the University of Missouri —Columbia, testified that any hearsay and third party statements contained in an investigative report presented to the Council are "tested by common sense and good judgment."

16. In his opinion, Professor Lowe stated that if the Big Eight were required to use live witnesses at its hearings that enforcement proceedings would be at a "standstill".

17. Professor Lowe stated that as a member of the hearing body, he would welcome the use of signed statements or affidavits as an alternative to live testimony.

18. Professor Lowe stated that because the council is a lay body, there are no presumptions or inferences of innocence or guilt.

19. It has been the experience of Professor Lowe that at least on one occasion the hearing body has refused to make a finding of fact that an infraction of the rules had occurred because the facts were "too remote" and insufficient.

20. Stanley was first aware of an investigation into the football program at OSU

when in early 1978 an individual threatened to "go to the president" unless Stanley took certain actions. Subsequently, an investigator of the Big Eight, Dick Martin, visited with Stanley on the OSU campus. During the investigation Stanley met with Chuck Neinas on three occasions. However, Stanley testified that at no time during the investigation was he informed of the specific nature or scope of the investigation.

21. Prior to the issuance by this Court of the temporary restraining order, Jim Stanley had been relieved of his duties as head football coach at OSU. In accordance with the terms of his employment contract, Stanley was to be reassigned to other duties by OSU. At the time of the hearing on the preliminary injunction, an agreement was reached (subject to the approval by the OSU Board of Regents) to release Stanley from his contract.

22. The reassignment and subsequent termination was due in part to the current Big Eight investigation of the OSU football program.

23. At the time Stanley was relieved of his duties, his annual income was in the neighborhood of $60,000 from both his employment contract and revenues from his television show.

24. Stanley was furnished with a copy of the report during the first ten days of November 1978.

25. The week preceding the scheduled hearing date, Stanley and his attorney met with the president of OSU, its faculty representative to the Big Eight, a Mr. Chapel, and the attorney for OSU. Mr. Chapel informed Stanley and his attorney of the manner and procedure to be followed at the scheduled hearing. Mr. Stanley was told that Mr. Neinas would read the allegations from the report, that President Bogler would read his statement, that Stanley could ask questions about the allegations, and that he could have his attorney present. It was Mr. Stanley's understanding that no witnesses would be called nor allowed.

26. Stanley talked with several of the individuals mentioned in the report but did not request them to be present at the hearing.

27. Stanley denies the allegations contained in the report insofar as they pertain to him.

28. No member of the Conference staff, including Mr. Neinas, informed Stanley of his right to bring witnesses to testify on his behalf at the hearing.

29. Jim Stanley, age 45, graduated from the Texas A. & M. University in 1959. He has spent his entire adult life as either an assistant coach or head coach of various high school, college and professional football teams. Most recently, Mr. Stanley has been the head football coach at Oklahoma State University. In this most recent position, Mr. Stanley has been relatively successful in that his record is over .500 and he has taken his teams to two post season bowl games. One of his teams shared the Big Eight Championship title. In recognition of his accomplishments he has been selected to assist in coaching several intercollegiate football teams for various charitable bowl games.

30. Jim Stanley has no other vocational or professional training or experience outside the world of athletics, and more specifically football. As Stanley testified, "football is my life, my profession."

31. Collegiate football on the major college level is extremely competitive. As a result, coaching positions are of somewhat tenuous duration. Mr. Stanley testified that he has had no less than seven coaching positions at six different institutions in his career. Mr. David Smith, also age 45, and most recently the former head football coach at Southern Methodist University testified that he had held coaching positions at no less than seven different institutions, including high school and professional football teams.

32. Mr. Julius Glossen testified that his career as an assistant football coach was terminated because of actions taken by the National Collegiate Athletic Association (NCAA) in reprimanding him for violations of various NCAA rules and regulations.

Mr. Smith testified that because of the same NCAA investigation of the football program at Southern Methodist University when he was head coach, his employment was terminated and he was unable to obtain comparable employment. His annual income dropped from around $42,000 while employed at SMU to just over $14,000 as an assistant coach at Vanderbilt. Mr. Smith and Mr. Glossen both testified that after numerous employment rejections from all types of institutions, they were forced to give up their coaching careers and to seek other employment. Mr. Smith is now self employed whereas Mr. Glossen is a dock worker.

33. As a result of the relative impermanence of a coaching position, those in the coaching profession are dependent upon their successful records and job performance and as importantly upon their reputations.

34. Although other assistant coaches who have been disciplined by various voluntary athletic organizations such as the NCAA and the Big Eight have been able to secure other positions within their profession, few head coaches, if any, who have been fired because of imposed sanctions have been able to secure other head coaching positions.

35. Mr. Stanley testified that he has already suffered injury to his reputation as a head coach because of the investigation and the report but that without an opportunity for a fair and impartial hearing on the allegations contained in the report, that he would suffer irreparable damage to his professional career. A finding of guilt as to the allegations would ruin his career, whereas a finding of innocence would only tarnish his name.

36. The original hearing scheduled for November 30, 1978, was postponed at the discretion of the Big Eight, rather than proceeding with the hearing under the restrictions of the temporary restraining order issued by this Court.[2]

37. Stanley testified that Neinas stated to him that if he (Stanley) would resign as coach, that it would be "easier on the University." Neinas denied the statement, and the Court makes no finding of fact on the issue.

## CONCLUSIONS OF LAW

### (a) State Action

■ For the purposes of applying the due process clause of the Fourteenth Amendment and the provisions of 42 U.S.C. § 1983, the activities of the Big Eight Conference constitute "state action". In *Regents of the Univ. of Minnesota v. National Collegiate Athletic Association,* 560 F.2d 352 (8th Cir. 1977), the Eighth Circuit found that the activities of the NCAA may constitute governmental action for this limited purpose. Therein, the Court stated its agreement with the decision in *Howard University v. NCAA,* 166 U.S.App.D.C. 260, 510 F.2d 213 (1975) which, after reviewing the functions of the NCAA, found state action to be present in its declaration of the ineligibility of certain student athletes to compete in intercollegiate competition. Because the Big Eight is composed solely of state supported public universities and because these state supported schools have delegated to the Big Eight certain functions such as supervision over intercollegiate athletics, without question the activities herein are "state action" for the limited purposes of applying the due process clause and § 1983. See *Wright v. Arkansas Activities Association (AAA),* 501 F.2d 25 (8th Cir. 1974).

### (b) Property And Liberty Interest Protected

■ In determining the extent of procedural due process to be afforded, a determination must first be made whether the interest is within the 14th Amendment protection. In this determination, the Court

---

**2.** A temporary restraining order was issued November 30, 1978 which restrained any hearing based upon the alleged activities of Jim Stanley unless such facts concerning such activities were elicited from live witnesses subject to confrontation and cross-examination by Stanley.

must look "not to the 'weight' but to the 'nature' of the interest at stake." *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548, 557 (1972) "Whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer grievous loss'." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972), citing to *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

In essence, plaintiff is alleging that his interests which should be afforded the procedural protections of due process are his good name and reputation for integrity *as they bear directly* upon his ability to obtain employment as a collegiate football coach in the future. In 1971, the Supreme Court stated "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential," and ". . . where the State attaches a 'badge of infamy' to the citizen, due process comes into play." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515, 519 (1971).

In 1972, in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, the mere nonretention of a state university professor was held not to have violated any "liberty" interest of the individual because the state did not impose upon him any stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities, nor any "property" interest because the terms of his employment provided for termination at the end of the academic year.

Finally in 1976, the Supreme Court exhaustively re-examined the historic trend of its decisions involving the stigmatizing effects of state action. In *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405, 414, the Court concluded that:

> . . . this line of cases does not establish the proposition that reputation alone, *apart from some more tangible interests* such as employment, is either "liberty" or "property" by itself sufficient to invoke

the procedural protection of the Due Process Clause. [emphasis added]

Therein, a police flyer listing the plaintiff's name and photograph among those of known shoplifters was distributed to various merchants after plaintiff's shoplifting charge had been dismissed. The Court concluded that the alleged defamation standing alone was not actionable under 42 U.S.C. § 1983.

*Paul v. Davis,* supra, does not stand for the proposition that an individual has no liberty interest in his professional reputation as it affects his future employment opportunities. Rather, that important decision established the outer limits of the protective shield of federal rights by holding that reputation standing alone and isolated from "some more tangible interest" is not a right entitled to constitutional and statutory redress if that reputation is injured by the state. Some of these "more tangible interests" have been determined by the Court to be: discharging of plaintiff from governmental employment, *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); barring the plaintiff from future governmental employment, *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951); depriving an individual of a right to purchase alcoholic beverages, *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), and suspension of a student from a public school, *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 792, 42 L.Ed.2d 725 (1975). Herein, the "more tangible interest" is Stanley's employment with OSU which has recently been terminated due at least in part to the allegations contained in the report, and his professional reputation which will determine his future employment opportunities.

Furthermore, and equally as important, is Stanley's tangible interest in the actual adjudication of his alleged activities. That is, the Conference will be performing a fact finding function to determine if its rules were violated by Stanley in particular and those associated with OSU in general. Because the Big Eight Conference through its

fact finding adjudicative hearing will be altering the existing rights of Stanley to pursue a common occupation in life, this action falls within the descriptive language of the Supreme Court that:

> In each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment. *Paul v. Davis,* supra, 424 U.S. at 711, 96 S.Ct. at 1165, 47 L.Ed.2d at 420.

In *Paul v. Davis,* this basic "alteration" was lacking in that the state action was defamatory but did not "worked any change of respondent's status as theretofore recognized" by law. 424 U.S. at 712, 96 S.Ct. at 466, 47 L.Ed.2d at 420. Herein, it cannot be said that Stanley's status will not be altered by the action of the Conference. Now that he is no longer an employee of the member institution, no *direct* sanctions can be levied on him personally. Nevertheless, a factual determination involving Stanley will still be made either directly or by implication in the findings in regard to OSU. These findings will be "working a change of [his] status" as a head football coach who is as yet untarnished by the stigmatizing effects of a finding of guilt. It is this adjudication of innocence or guilt that constitutes the additional "tangible interest".

Therefore, it is the conclusion of this Court that the plaintiff has demonstrated that he possesses a very distinct liberty interest which could be drastically altered by state action. To utilize the convenient phrase proposed by the defendants in their very capable brief, Stanley passes the "stigma plus" test required by *Paul v. Davis.* If Stanley were merely seeking damages in a post hearing action against the Conference for damage to his reputation via a § 1983 action the dictates of *Paul v. Davis* could

arguably be applicable, for the Supreme Court reiterated that the Fourteenth Amendment should not be made a "font of tort law to be superimposed upon whatever systems may already be administered by the States." 424 U.S. at 701, 96 S.Ct. at 1160, 47 L.Ed.2d at 413. But to hold that Stanley has no liberty interest which can be protected herein so as to afford to him the essentials of due process would allow the defendant to proceed with impunity in disregard of due process concepts.

Finally, a review of the cases and decisions involving liberty and property interests reveals that for purposes of classification, Stanley's interests are more accurately termed "liberty interests" for Stanley has no contractual or statutory entitlement to continued employment within the Big Eight or at OSU now that his contract has been terminated. As stated in *Roth,* supra, 408 U.S. at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 561:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a *legitimate claim of entitlement to it.* It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives  .  .  .

Whereas, liberty:

> denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge  .  .  .  and generally to enjoy those privileges long recognized  .  .  .  as essential to the orderly pursuit of happiness by free men. *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045 (1923).

### (c) Process That is Due

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972). The inherent flexibility of procedural due process is a recognition by the

Supreme Court that "not all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey,* supra, 408 U.S. at 481, 92 S.Ct. at 2600, 33 L.Ed.2d at 494.

■ The due process clause is not a barrier protecting the individual from any deprivation of his property or liberty. Due process rules are meant to protect the individual from the:

mistaken or unjustified deprivation of life, liberty, or property. Thus, in deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that 'procedural due process rules are shaped by the risk of error inherent in the truth-finding process . . . Such rules 'minimize substantively unfair or mistaken deprivations of' life, liberty, or property by enabling persons to contest the basis upon which the State proposes to deprive them of protected interests. [citations omitted] *Carey v. Piphus,* 435 U.S. 247, 259–60, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252, 262 (1978).

■ In determining what level of process is due, the Court, after identifying the interest that will be affected by the official action, must examine the risk of an erroneous deprivation of the interest through the procedures to be used, and the probable value, if any, of additional or substitute safeguards. Finally, the defendant's interest must be viewed to determine the fiscal and administrative burdens imposed by the additional or substitute procedures. *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 33 (1976).

Although the interest of the plaintiff has been examined, supra, the Court reiterates that based upon the testimony and this Court's findings of fact, an adjudication by the defendants that Stanley is indeed "guilty" of the alleged infractions would no less be injurious to the plaintiff now that he is unemployed than it would be if sanctions could be imposed upon him. The injury stems not from the direct sanctions but from the possible finding of "guilt".

Mr. Neinas testified that now that Mr. Stanley is no longer an employee of OSU, that no sanctions can be imposed directly upon him. Defendants argue therefore, that the only remaining interest of Jim Stanley is that of his good name, and accordingly under the dictates of *Paul v. Davis,* the possible defamatory findings of the Big Eight will not cause constitutional injury to the plaintiff. This argument ignores the possibility of the Big Eight from barring any other Big Eight institution from hiring Stanley and the possible NCAA "blackballing" of Stanley as testified to by Mr. Glossen. Therefore, although no direct sanction can be personally imposed upon Stanley the Big Eight and NCAA possess the ability of preventing member institutions from employing the plaintiff. Therefore, although the sanction may be indirect in the sense that it is administered through the institutions, the practical effect is that based upon the adjudication, this plaintiff's future employment opportunities may be severely restricted. The Court is also troubled by the proposition of defendants that if Stanley had not been terminated as coach, he would have possessed a greater interest in the adjudication because of the personal sanctions which could have been imposed but now that his contract has been terminated, Stanley loses his interest in the same adjudication of the same facts. Clearly, the plaintiff's interest may be of greater *weight* if he were still an employee of OSU, but the *nature* of the interest remains identical. See *Board of Regents v. Roth,* supra, 408 U.S. at 570, 92 S.Ct. at 2705, 33 L.Ed.2d at 557.

Because the Conference's hearing council is charged with fact finding to determine if the infractions occurred as alleged, the level of due process to which plaintiff is entitled will be measured from an adjudicative standard rather than from that line of cases which define the level of process due wherein the facts are not disputed but have been established. (See *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) wherein the plaintiff who had his driver's license revoked did not challenge the fact that he had compiled the requisite number of points due to speeding convictions, but

only sought a hearing at which he could argue mitigating circumstances and seek leniency.) This fact finding process must be initially reviewed for a consideration of the risks of producing a deprivation upon erroneous or mistaken facts.

Of greatest concern to the Court is that the author of the investigative report is free to draw certain inferences beyond those statements of fact made to him in his interviews.

For example, on page six of the report it is stated [3]:

> The purpose of the meeting, as stated by three of the four Regents who were in attendance, was a request by the NCO to have the University retain [Mr. X] on its payroll. Two of the Regents stated that representatives of the NCO said that the organization was broke and having difficulty meeting its expenses, because Coach Stanley had spent all the money, the inference being that money had been provided to Oklahoma State University football players.

It is this type of inference that the investigator is free to draw. Furthermore, the author of the report presents statements made to him in a fashion that may not necessarily be prejudicial or biased but may certainly be classified as not completely neutral [4]. It is this unconscious subjective coloring of the statements that troubles the Court. Accurate findings of fact should not be made upon predigested information.

Furthermore, the report is replete with hearsay and double hearsay. Professor Lowe testified that although there are two law professors as faculty representatives on the council, it is essentially a lay body untrained in the law. He stated that it relies on good judgment and common sense when confronted with hearsay and inherent inferences. This Court concludes that the risk is grave indeed for an erroneous or mistaken

deprivation based upon *this particular report* which will be presented to the council. The interests of the plaintiff are too great to be determined by this particular investigative report.

As stated in *Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287, 300, "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." The Supreme Court quoted at length in *Goldberg* the analysis in *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) wherein the Court concluded that the individual is entitled to an opportunity to refute the allegations which are based on testimony of persons whose:

> memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy.

Stanley has stated in his testimony that the allegations are untrue as to his involvement in the alleged infractions. Yet for him to reveal the possible faulty memories, the possible jealousies and prejudices or ill motives of the interviewees, he must operate under the handicap of refuting *summaries* of statements as reported by the investigator in the report. The report does commendably list by name approximately fifty individuals who were interviewed and provided statements. However, substantial allegations rest upon unnamed sources and inferences.

The Court is also troubled with the total lack of appellate review. That is, although in theory a new hearing could be reconvened based upon newly discovered evidence or upon substantial changes in statements, essentially Stanley is afforded a "one shot" opportunity before the council which determines his guilt. Because of this, the risk of findings being made on

---

3. The parties have requested that the report remain confidential. However, the plaintiff's attorney read this portion of the report into the public record at the hearing on this preliminary injunction thereby waiving the confidential status of this paragraph.

4. The Court is not critical of Mr. Neinas nor Mr. Martin but of the procedural process involved. Few investigative reports can be written in a totally objective manner void of the author's subjective attitudes.

possibly erroneous or mistaken facts must be minimized and the individual afforded a greater and more meaningful opportunity to refute the summarized statements.

The alternatives for safeguarding the interests of the plaintiff are numerous. The practical and financial burdens could be minimized by the adoption of simple alternative procedures. One of the most obvious is that rather than having a finder of fact determine if the allegations are true based upon a summarization and inherently non-objective report of what others have stated to the investigator, who may or may not be the final author of the report, would be to require that all statements obtained from potential witnesses be reduced to writing. This written statement could then be shown to the declarant who could be offered the opportunity to make corrections or additions. The declarant could be requested to either sign the statement or appear before a notary to transform it into an affidavit. If the declarant declines, the investigator could then note upon the statement that the declarant did not wish to subscribe to his statement. This simple procedure would be of assistance to the fact finder, as testified by Professor Lowe. Rather than rely upon the lay body's "common sense and good judgment" to identify hearsay, this simple procedure would provide the council with some objective method of attaching credibility to the statements. Obviously, an affidavit would carry more credibility than an unsigned statement.

A summary of the statements could be provided to the institution and the individual along with the written notice of the charges of alleged infractions. A listing of the possible witnesses and declarants could also be provided. Upon service of this notice, the institution and the concerned individuals could then be given an established period of time in which to express their desire to challenge the factual statements. As stated in *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977), the purpose of a hearing in a "stigmatizing" deprivation is:

to provide the person an opportunity to clear his name. If [the individual] does not challenge the substantial truth of the material in question, no hearing would afford a promise of achieving that result for him.

If the Commissioner is notified in writing that the allegations are not to be challenged, the Council could be convened and presented with the allegations with an opportunity for the subject institution and individuals to be present to make any mitigating presentations they may desire to make. Appropriate sanctions could be levied based upon the unchallenged allegations.

If the allegations are challenged, a fact finding hearing would be required. In *Behagen v. Intercollegiate Conference of Faculty Rep. (Big Ten),* 346 F.Supp. 602, 608 (D.C.Minn.1972) the Court held that a full judicial hearing with the right to cross-examine witnesses was not required in a fact finding hearing concerning suspensions of student athletes from athletic competition. However, that Court stated for further guidance that the hearing should include direct testimony of individuals with knowledge of the events. To this Court, a requirement of live witnesses would necessarily entail the opportunity to cross-examine those witnesses.

The Court notes that the defendants do not possess subpoena powers and that the transportation of fifty witnesses to Kansas City would cause financial hardship on all involved. A simple alternative would entail the conference holding its fact finding hearing on the challenged allegations at the member institution's campus where the witnesses would be available for both parties. The witnesses could be invited to attend to reiterate their statements, subject to cross-examination. If they declined to personally appear, the Council could be provided with the affidavits or signed or unsigned statements. Naturally, strict conformance to the rules of evidence would not be required and hearsay testimony would be allowed in certain instances upon a showing that the declarant is unavailable.

Of primary importance herein, is the desire of the Conference to "vindicate its own authority to interpret its own rules, an authority which we agree is of the utmost importance to the execution of the Association's salutory goals." *Regents v. NCAA*, 560 F.2d 352, 372 (1977). The above outline of possible alternative methods is not binding upon the defendants. It is only recited for the purpose of demonstrating that other practical alternatives exist to safeguard the rights of this plaintiff negating the inference that the current procedure is the sole viable method. The Court notes that to require the defendants to completely reconstruct this investigation to conform to these suggestions would be an unreasonable hardship. Nevertheless, the rights of this plaintiff cannot be allowed to be drastically altered by a process so lacking in procedural safeguards.

## CONCLUSION

The plaintiff has prayed for the following relief:

(1) the right to elicit testimony upon oath of the declarant;

(2) the right to confront each of the witnesses who may give testimony against plaintiff's interests;

(3) the right to cross-examine all such witnesses by and through counsel;

(4) the right to compulsory process to obtain testimony and documents in his behalf;

(5) the right to a written transcript of proceedings.

The basic elements of "notice" of the hearing and an "opportunity to be heard" which are the very foundations of due process have been, and will be, afforded to the plaintiff. Legal counsel will be permitted to attend and to represent the plaintiff. The proceedings will be taped and a transcript will be available to the parties. The Court has no inherent legislative power to grant subpoena powers to the parties. Therefore, the sole issue of what additional process that is due in the hearing is whether the plaintiff should be afforded the right to have the allegations supported by way of witnesses subject to cross-examination or by way of other alternative safeguarding procedures.

The Court hereby determines that plaintiff possesses a recognizable constitutional liberty interest which cannot be deprived without due process, that the process to be granted the plaintiff by way of an adjudication upon this investigative report does not satisfy the requisite level of due process, that other safeguarding procedures can be devised at a minimum inconvenience to the defendants and that the plaintiff should be afforded the right to have the allegations presented by way of witnesses subject to cross-examination or by some other alternative procedure which will adequately safeguard the plaintiff's interests.

Accordingly, the plaintiff's application for a preliminary injunction restraining the scheduled Big Eight hearing is granted in part, and the defendants are to report to the Court of procedures which will comport with the demands of due process as more fully set forth herein. As guidance to the parties, certain preliminary steps could be taken which may include the following:

1. The defendants could advise the plaintiff of the specific infractions with which he is charged.

2. The defendants could provide the plaintiff with the names and addresses of each witness which the defendant will utilize to support each such charge and whether such witness or witnesses would voluntarily:

(a) appear to testify at the hearing; or,

(b) testify by way of a deposition; or,

(c) submit an affidavit as to the facts on which defendants will rely.

3. The plaintiff could report in writing to the defendants each charge which he specifically denies.

4. The plaintiff could provide the defendants with the names and addresses of each of defendants' witnesses which the plaintiff wishes to have produced for confrontation and cross-examination.

5. The plaintiff could furnish the names and addresses of each witness on which he relies in his defense of each charge.

6. If any witness for either party refuses to give testimony at the hearing or by way of deposition or refuses to give an affidavit, the party relying on that witness could advise the other party of the reasons for such refusal.

Finally, the Court finds that the requirements for a preliminary injunction have been met. Under the latest standard, the plaintiff must show either (1) a probability of success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits of the case to make them fair grounds for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Fennell v. Butler,* 570 F.2d 263 (8th Cir. 1978). Plaintiff has met his burden under both tests.

Accordingly, for the reasons stated herein, it is hereby

ORDERED that the defendants are restrained and enjoined from holding a hearing on any infractions in which the plaintiff Jim L. Stanley allegedly played an active part either through his actions or omissions until such time as defendants have reported to the Court in writing outlining a procedure which this Court finds to comport with the due process to which the plaintiff is entitled under the facts of this case; and it is further

ORDERED that such report should be filed within thirty days from the date of this order unless cause is shown in writing why the time allowed is inadequate.